IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

LEVI MYRICK,

                         Plaintiff,

      v.

JAMIE GOHDE, TRISHA ANDERSON,
MELISSA THORNE, DENISE VALERIUS,
ANGELA HODGE, LAURIE WOOD,
MICHAEL DITTMANN, LUCAS WEBER,
DR. SALAM SYED, KATHLEEN WHALEN,
and NEAVER WALTERS,

                      Defendants.

OPINION AND ORDER

17-cv-603-wmc

---

*Pro se* plaintiff Levi Myrick was granted leave to proceed against several Wisconsin Department of Corrections ("DOC") employees working at the Columbia Correctional Institution ("CCI") under 42 U.S.C. § 1983 for alleged violations of his Eighth Amendment rights. More specifically, Myrick contends that while incarcerated at CCI between 2015 and 2018, defendants failed to ensure or provide adequate treatment for his chronic back condition. Before the court is defendants' motion for summary judgment, as well as Myrick's renewed motion for assistance in recruiting counsel. (Dkt. ##65, 87.) For the reasons that follow, the court will grant defendants' summary judgment motion.[1]

---

[1] Accordingly, Myrick's motion for assistance in recruiting counsel will also be denied as moot. In addition, in opposition to defendants' motion, Myrick also asserts that defendants were negligent in violation of Wisconsin state law. (*E.g.*, dkt. ##82 at 11, 83 at 5.) However, the court only granted him leave to proceed on Eighth Amendment deliberate indifference claims (dkt. #25 at 10), and Myrick never sought reconsideration of the court's screening order. To the extent plaintiff believes he was pursuing negligence or medical malpractice claims under state law, those claims were dismissed without prejudice.

UNDISPUTED FACTS[2]

### A. The Parties

For all times relevant to this complaint, Myrick was an inmate in the custody of the DOC and housed at CCI.  As for defendants, Michael Dittmann was CCI's warden from 2014 until his retirement in 2018; Lucas Weber is CCI's Deputy Warden, and he was its Security Director from May 2013 to December 2018; and Dr. Salam Syed was formerly employed as a physician at CCI from 2014 until 2018, and he has been continuously licensed as a physician in Wisconsin since 2009.  From October 2016 to July 2017, Dr. Syed also covered physician vacancies at other DOC institutions.  Defendants Trisha Anderson, Melissa Thorne, Denise Valerius, Laurie Wood, Neaver Walters, and Kathy Whalen were all registered nurses working as nurse clinicians in the health services unit ("HSU") at CCI at various times during the period relevant to Myrick's complaint.  Finally, Angela Hodge worked as Nursing Supervisor in the HSU from December 2017 until August 2019, and defendant Jamie Gohde was that unit's Health Services Manager from July 2016 to May 2017.

### B. Background

Inmates communicate with the HSU via written interview and information requests

---

[2] Unless otherwise noted, the following facts are material and undisputed.  Consistent with its practice, the court has drawn these facts from the parties' proposed findings and the evidence of record, when viewed in a light most favorable to plaintiff Myrick.  *Miller v. Gonzalez*, 761 F.3d 822, 877 (7th Cir. 2014) ("We must . . . construe the record in the light most favorable to the nonmovant and avoid the temptation to decide which party's version of the facts is more likely true.").  The court notes that Myrick did not respond to all of defendants' proposed findings of fact.  Therefore, the court has deemed certain facts proposed by defendants undisputed if supported by admissible evidence.  *Doe v. Cunningham*, 30 F.3d 879, 883 (7th Cir. 1994).

and health service requests ("HSRs"), which among other things serve to document requests for medical care and appointments, complaints of symptoms, and other, health-related issues.  One of the duties of a nurse clinician is to triage requests, including those addressed to a manager, which means assessing them to ensure that patients receive appropriate attention with the requisite degree of urgency.  All requests received on a given day are to be triaged within 24 hours.[3]

Nurse clinicians cannot prescribe medications or refer an inmate for an appointment with a DOC specialist or an outside provider.  Only a nurse practitioner or physician can prescribe medications or make those referrals.  However, nurse clinicians are responsible for managing medications.  Upon receiving a prescriber's written order for a medication, a nurse transcribes or signs off on the order, then sends it to Central Pharmacy Services to be filled.  Medications typically take 3 to 5 days to be received and checked into the medication room for delivery to the patient, but they can take as long as 7 to 14 days to deliver.  While some medications are designated keep-on-person -- meaning that an inmate can self-administer them -- other medications are staff-controlled and only distributed by nurses or correctional officers during a "medication pass."  CCI's Security Director is responsible for informing the HSU of inmate conduct reports based on the misuse of a medication.[4]

---

[3] Myrick does not dispute how HSRs are triaged upon receipt, but asserts that responses to HSRs are not always "timely" received.  (Dkt. #83 at 2.)

[4] In contrast, although Myrick purports to dispute it, the security director is not involved in the decision to change or discontinue an inmate's medication.   Specifically, Myrick contends that Weber ordered "the abrupt discontinuation" of his pain medication, "as it shows" in the fourth paragraph of the state defendants' brief in support of their motion for summary judgment.  (Dkt.

As of 2017, prisoners' medical appointments at CCI were tracked via a data management program accessible to all HSU employees. The nurses are primarily responsible for scheduling appointments with the nursing staff and in-house physicians. Physicians do not schedule appointments; instead, the medical assistant working with an in-house physician has the responsibility to create a list of up to 12 to 15 patients whom that physician would see each day. Typically, the physician will then triage this list, seeing the patients in the order he or she sees fit. When the physician is unable to see all patients scheduled on a given day, those patients are rescheduled. Except for the segregation units, which have assigned clinic times each week, patients are not assigned specific appointment times, but rather summoned in the order scheduled.

While HSRs are triaged daily, there are many reasons why an inmate's physician appointment might still be changed. For example, if injuries or other emergencies occur, the doctor may need to see another patient, and more routine appointments may be moved or cancelled. In addition, appointments with other patients may run long, or security situations (such as lockdowns, training days and modified movements) within the institution may result in patients not being seen by the physician as scheduled.

The health services manager provides overall administrative support and direction of the unit, but may not prescribe medications or have control over the schedules of physicians or outside specialists. Ultimately, the warden hires and is responsible for the general supervision of the HSU's health services manager, but the warden does not hire

---

#83 at 1-2.) However, that paragraph is merely a summary of *Myrick's* allegations against Weber and Dittmann, which does not even mention medications. (Dkt. #73 at 2-3.)

doctors, nurse practitioners, or advanced care practitioners.  Although the warden is copied on DOC Bureau of Health Services decisions regarding inmate complaints about medical issues, the warden also has no role in the investigation or determination of how to resolve those complaints.

### C. Myrick's Medical Treatment in 2015

Myrick has a history of chronic back pain.  In January 2015, Myrick saw a nondefendant, Dr. Karl Hoffman, for severe lower back pain radiating down his left leg. After noting that Myrick was able to work out regularly, Dr. Hoffman prescribed Myrick 600 mgs of the pain medication gabapentin, to be taken once daily.

In February, Myrick twisted his back while working in the kitchen.  Defendant Nurse Whalen examined him on February 11, 2015, and noted that Myrick was not in acute distress and had been managing his pain well.  Whalen recommended that Myrick continue taking his prescribed medications, including gabapentin, but cleared Myrick to return to work.

On April 3, 2015, Myrick submitted an HSR stating that he was experiencing a lot of pain in his lower back and left leg, as well as having difficulty sitting or lying down. Nurse Whalen responded on April 5 that Myrick was scheduled for a follow-up appointment with a doctor.  When he saw defendant Dr. Syed on April 9, Myrick explained that he had been suffering lower back pain for at least a couple of months to years that sometimes radiated down to his thighs and calf.  The doctor's notes that day indicate radiculopathy or nerve pain in the lumbar and lower extremities, but Myrick denied feeling numbness or weakness and refused to be released from work.  Instead, Dr. Syed prescribed

1000 mgs of Tylenol and 500 mgs of the nonsteroidal, anti-inflammatory drug naproxen for three months each, along with 100 mgs of the narcotic-like pain reliever tramadol for two weeks. Dr. Syed also ordered Myrick a back-support belt, an extra pillow, a lumbar x-ray, and a follow-up appointment in one month.

Myrick had an x-ray of his lumbar spine on April 14, 2015, from which the radiologist concluded that Myrick's lumbar spine series was normal. Nevertheless, on April 20, 2015, Myrick submitted an HSR stating that tramadol was more effective than gabapentin at controlling his pain but that he was still experiencing pain and some numbness in his left leg. Accordingly, Myrick asked to either be allowed to continue taking tramadol beyond the trial 10-day period or to see a doctor. Nurse Anderson responded that same day, instructing Myrick to discuss his concerns at his next scheduled appointment.

When no appointment was scheduled, Myrick again asked to see a doctor via an HSR received by HSU on May 5, to which another nondefendant, Nurse Veyna, responded that he had an appointment scheduled. Myrick then submitted another HSR on May 11, complaining that he had been told numerous times that he was scheduled to see a doctor, but had yet to be seen and was in severe pain. Although, Anderson responded on May 18 that all non-emergency appointments had to be rescheduled due to a lockdown, she again assured Myrick that he was scheduled to be seen soon.

Dr. Syed saw Myrick the very next day, and it is undisputed that he was not able to see Myrick any sooner because of the lockdown. At that appointment, Myrick reported that his back continued to hurt, and the pain radiated to his foot at times. Myrick also

said tramadol helped, and he denied feeling any weakness, tingling or numbness in his back or extremities. Accordingly, Dr. Syed discontinued the prescription for Tylenol he had ordered Myrick in April, and instead ordered a 60 mg toradol injection to reduce Myrick's pain and a 10-day prescription of Tylenol #3. The next day, May 20, Myrick complained via an HSR that Tylenol #3 hurt his stomach. In response, nondefendant Dr. Hoffman discontinued Tylenol #3 and prescribed 50 mgs of tramadol for 10 days *without* refills.

Once the tramadol ran out, however, Myrick began submitting HSRs complaining of worsening pain. In reply to his June 1 request to see a doctor, Nurse Anderson advised on June 2 that Myrick was once again scheduled to see a physician. On June 11, Myrick acknowledged in an HSR that the lockdown had caused delays in the HSU, but advised that the other pain medication he was receiving was not effective on its own and asked to add naproxen. A nondefendant nurse responded on June 12 that Myrick had another appointment scheduled. On June 15, Dr. Syed prescribed 500 mgs of naproxen twice daily for three months and discontinued ibuprofen at Myrick's request.

HSU next received a HSR from Myrick on June 17, asking if he could be seen soon because his pain was getting worse, to which a nondefendant nurse responded the very next day, stating that Myrick was scheduled to be seen on July 2. In a June 28 HSR, apparently still not having seen a doctor, Myrick indicated that he had yet to receive naproxen and was now without ibuprofen. That same day, Nurse Valerius responded: (1) Myrick would be seen by a doctor very soon; (2) naproxen had been sent to him on June 19; and (3) she would send a second medication card for the drug.

As promised, Myrick saw Dr. Syed the following day, June 29.  He described a burning sensation in his lower left leg, and significant shooting pain radiating down to his calf and foot, but denied any tingling, numbness or weakness.  In response, Dr. Syed referred Myrick to neurosurgery at the University of Wisconsin Hospital for a sciatica consult and possible MRI.  Dr. Syed also ordered an extra pillow and back support brace for one year, ice packs as needed for three months, and 1-2 tablets of Tylenol #3, three times a day or as needed.

In an HSR received by HSU approximately one week later, on July 7, Myrick asked to see the doctor again, complaining that his pain had not improved and his Tylenol #3 was out after just seven days.  On July 13, Myrick again raised the question of his Tylenol #3 prescription and asked for a low bunk restriction.  Nurse Thorne responded to both the July 7 and 13 HSRs, confirming that a neurosurgery consult had been ordered for Myrick and noting that Myrick was also receiving naproxen.  Moreover, Thorne twice explained that the Tylenol #3 prescription would run out after seven days if Myrick had been taking the full dose of 2 tabs three times a day.  As for a low bunk restriction, Thorne referred that request to the special needs committee.

Defendant Valerius reviewed Myrick's July 15 HSR complaining that his left foot was becoming numb more often and that his back and leg pain was worse.  After reviewing Myrick's medical chart, Valerius responded on July 19 that Myrick had been seen on June 29 and had been referred to neurosurgery.  She added that getting an appointment at the University of Wisconsin took time.  Myrick persisted, sending two more HSRs on July 20.  One inquired about his lower bunk restriction, to which Valerius responded that the special

needs committee had not yet met to review Myrick's request but that he was scheduled for a nursing evaluation to facilitate the request.  In the other, and in a similar HSR received on July 22, Myrick renewed his complaint about worsening back and leg pain.  After again reviewing Myrick's medical records, Valerius responded to those HSRs on July 26 as follows:

> You were seen by the MD on 6-29-15.  You have pain relief measures in place.  This does not require monthly MD appts.  You are being referred to a specialist to provide relief we don't have at our disposal here.  Please try to be patient.  Specialist appointments take time.  Maybe taking a break from rec is indicated to ensure no further damage.

On July 27, a nondefendant, Nurse DeJager, also evaluated Myrick in response to his HSRs about ongoing, severe lower back pain.  Myrick sent a follow up HSR that same day asserting that he had spoken with a nurse and the HSU manager and that both promised to investigate his complaints.  Myrick also again emphasized that he was in serious pain; something was wrong; he was not receiving responses to his HSRs; and he wondered whether he was being refused medical attention.  Nurse Thorne replied to this July 27 HSR the next day, advising Myrick to discuss his concerns with the doctor and checking boxes on the form indicating that Myrick was scheduled to be seen.

Nurse Valerius apparently reviewed Myrick's medical records again sometime after receiving his next HSR on July 30, 2015, which repeated his request to see a doctor and indicated that he could barely move, was in more pain than ever, and had no pain relief at all.  As part of that review, defendant Valerius attested that she learned Myrick had been seen on July 31 by another nurse for his back pain and had reported that his current prescriptions for gabapentin and naproxen were not helping.  That nurse further noted that

9

Myrick was on a lower bunk restriction, indicated that he should not work or have recreation time, *and* contacted a nondefendant doctor, who placed a prescriber order for one tablet of Tylenol #3 three times daily as needed for ten days.  However, Dr. Syed discontinued that prescription on or about August 8 after learning from defendant Whalen that Myrick had tried to "cheek" his Tylenol #3 tablet on medication pass that day.

Nurse Valerius ultimately responded to Myrick's July 30 HSR on August 9, indicating that he would see a doctor "very soon."  Dr. Syed then saw Myrick on August 10, who once again reported that he was in pain and asked for tramadol, yet according to Syed exhibited no new signs or symptoms.  During this visit, defendant Syed had a long discussion with Myrick, addressing Myrick's upcoming neurosurgery appointment and stating that if no abnormalities were found in the MRI results, he would not prescribe Myrick any more narcotics.  However, Syed indicated that he would prescribe tramadol pending pharmacy approval because Myrick had been taking that medication for a longer period of time.  Syed then prescribed Myrick two 50 mg tablets of tramadol twice a day for ten days and 1000 mgs of Tylenol twice a day, as needed.  However, two days later, on August 12, Dr. Syed discontinued Myrick's tramadol after he received a conduct report for misuse of medication.  Dr. Syed also referred Myrick to radiology for a lumbar spine MRI on August 13 to confirm a sciatica diagnosis and because Myrick continued to report symptoms that were not responding to treatment.

When Myrick asked in his August 17 and 26 HSRs why the tramadol prescription had been discontinued, as well as complained that his gabapentin and Tylenol were not enough to relieve his pain, Nurse Anderson responded on September 4 that Myrick had

been caught misusing his medications.   A nondefendant nurse also responded on September 3 to two similar HSRs dated September 1, explaining to Myrick that:  (1) the HSU was waiting for a call from neurosurgery with an appointment time; and (2) the MRI results were necessary for the doctor to determine the next phase of treatment for his back pain.

Myrick finally had an MRI on September 11, 2015.  The results generated that same day indicated a normal alignment of the spine, no significant abnormality, and were generally unremarkable for Myrick's age.  However, there were mild degenerative changes, the worst at the L4-L5 vertebrae, where there was mild bilateral foraminal narrowing greater on the left than the right.  When Myrick inquired about the MRI results in a September 18 HSR, defendant Anderson responded the same day that the results would be reviewed during chart review and that Myrick had a follow-up appointment scheduled with a doctor.  In response to a second inquiry a week later, a nondefendant nurse also indicated that Myrick had a follow-up appointment scheduled, but offered Myrick the chance to be seen earlier by a nurse if he wanted.  Myrick received a similar answer from another nondefendant nurse to another October 6 HSR, which again asked about his MRI results and complained of severe pain.

Dr. Syed had a follow-up appointment with Myrick on October 9, to discuss the MRI results.  On October 1, Dr. Syed had received a message from the neurosurgery clinic stating that no follow-up consult with Myrick was necessary in light of the mild findings on his MRI, and recommending that Myrick engage in spine rehabilitation or physical therapy instead.  Defendant Syed discussed the MRI results with Myrick during the

October 9 visit, including the clinic's recommendation for physical therapy, and Myrick agreed.  Myrick also requested Tylenol and tramadol.  Dr. Syed prescribed 1000 mgs of Tylenol twice a day as needed for six months, but declined to order tramadol because of Myrick's history of diverting medications.[5]

Defendants assert in reliance on physical therapy notes from 2015 that a physical therapist ordered six sessions for Myrick on November 9, 2015, with the goal of reducing lower back pain and increasing function by improving core stability.  (Dkt. #71-1 at 26, 38-47.)  Myrick disputes that he was discharged after three appointments because he was progressing well and attending recreation, but he relies himself on physical therapy notes from his December 2017 and January 2018 sessions.  (Dkt. #71-1 at 116-26.)

### D. Myrick's Medical Treatment in 2016

Defendant Dr. Syed renewed Myrick's gabapentin prescription on January 6, 2016, and for the next several months, Myrick was treated for other health issues, including chest pain and an ankle injury sustained while playing basketball.  For months after, Myrick raised no further concerns about his back pain.

That ended on September 18, 2016, however, when Myrick submitted an HSR about his gabapentin prescription for his sciatica and back pain.  Specifically, Myrick complained that the medication had either been taken or the prescription expired, and his pain was starting to worsen again.  Nurse Valerius responded that same day, confirming

---

[5] Myrick does not directly dispute the MRI results or defendants' version of what occurred at this appointment, but he notes that Dr. Syed would renew Myrick's prescription for gabapentin in January 2016, despite stating in August 2015 that he would not prescribe any more narcotics if the MRI findings were mild.  However, Myrick offers no evidence that gabapentin is a narcotic.

that Myrick's gabapentin prescription had indeed expired and his request had been submitted to a doctor for renewal.  Still, Valerius also noted that Myrick should not be without gabapentin because a 40-day refill had been sent on September 12; as a result, Valerias advised Myrick to ask the correctional officers on his unit about the whereabouts of that refill.  Myrick does not dispute that correctional officers are responsible for distributing certain medications like gabapentin during medication pass, but asserts that it is not the officers' responsibility to locate his medication.[6]  In response to Myrick's follow-up HSR on September 27, defendant Nurse Thorne indicated that 120 tablets of gabapentin had been sent on the 26th.  On November 2, Thorne responded to Myrick's latest request for sciatica pain relief by indicating that he was scheduled to be seen by a nurse.  Once Myrick transferred from CCI to the Wisconsin Resource Center on November 3, 2016, a nondefendant doctor increased his gabapentin dose.

### E.  Myrick's Medical Treatment in 2017

Myrick returned to CCI on January 12, 2017.  Among his medication orders on transfer was 900 mg of gabapentin daily and 500 mg of naproxen twice a day for three months.  On January 23, Advanced Care Nurse Practitioner Jane Waldstein discontinued Myrick's 900 mg gabapentin prescription, instead ordering an "MD visit to discuss gabapentin use and continuance."  (Dkt. #71-1 at 108.)  Waldstein did not consult with defendant HSU Manager Gohde about that decision.

---

[6] In support, Myrick references "Def. Declaration of what nursing Responsibilities Are."  (Dkt. #83 at 4.)  There is no such declaration in the record.  Defendant Nurse Valerius states in her declaration that nurse clinician duties include managing medications, but she also asserts without dispute that certain medications are staff-controlled and distributed by the officers.  (Dkt. #68 at 8, 11.)

Myrick received gabapentin until January 25, 2017.  He then went without this medication until Dr. Syed renewed it on February 22, 2017.[7]  Myrick submitted several HSRs in the interim asking about his gabapentin prescription and complaining of worsening pain, and at times asking to see a doctor.  Nurse Valerius responded to his January 27 HSR on January 28, explaining that a doctor chose not to renew the prescription on January 23 and that Myrick's request would be forwarded to the doctor for reconsideration.  Valerius attested that she did not contact the on-call physician at that time because she concluded that this HSR did not require an emergency response.  Nurse Anderson gave a similar response on January 31 to a January 28 HSR, which acknowledged that he had naproxen, a back brace and a lower bunk restriction, but noted that he still needed gabapentin to control his severe back pain.

Myrick next submitted two HSRs on January 30.  In one, he again requested gabapentin; in the other, he requested a medical records review.  Defendant Nurse Walters responded that Myrick needed to request a sick call to be evaluated in the HSU, and she would forward his records review request to the appropriate department.  In response to Myrick's three subsequent February HSRs asking for his medication and to see a doctor for his severe back pain, other nondefendant nurses indicated that Myrick was scheduled for a sick call.

---

[7] While none of the named defendants may be personally responsible for this medication interruption, the court is troubled by the decision of Nurse Practitioner Waldstein to discontinue Myrick's high-dose gabapentin prescription completely, apparently leaving him without needed pain medication, especially where there seems to have been *no* system in place to insure that the follow-up appointment by a physician she "ordered" would actually occur promptly.  *See* discussion, *infra*, pp. 51-54 & n.15.

On February 14, 2017, Nurse Walters saw Myrick, who complained of lower back pain that shot down his left leg and made it difficult to sleep.  He also asked to see a doctor. In response, Walters gave Myrick some physical therapy exercises for his back and scheduled him for an appointment with a doctor within seven days.  On February 24, still not having been seen by a doctor, Myrick submitted another HSR, noting that the nurse he saw on February 14 could not help him and that he needed to see a doctor.  Nurse Valerius responded the next day that Myrick was scheduled to be seen by a doctor on February 28 regarding his back pain, among other issues.  A nondefendant nurse responded similarly to his follow up HSR received on February 28.

While Myrick was never seen by a doctor in February as repeatedly promised, Dr. Syed did prescribe Myrick 800 mgs of gabapentin four times a day for three months on February 22 as previously noted, and he extended the prescription for six months on February 24.  Also, in February, Myrick sent interview or information requests to HSU Manager Gohde.  In the first, dated February 5, Myrick explained that he had written several HSRs about his expired gabapentin prescription and requested to be seen for his ongoing back pain.  Gohde attests that she first learned of and reviewed that request on February 22.  After reviewing Myrick's medical records, she realized that:  (1) Myrick's gabapentin prescription had not been renewed; and (2) he had not had an appointment with a doctor.  Since the medical records reflect that Dr. Syed ordered gabapentin that same day, Gohde further believes that she must have conferred with defendant Dr. Syed regarding Myrick's concerns.  Regardless, Gohde responded to Myrick's request on February 26, noting that:  (1) he had two recent HSU appointments with nurses on

15

February 14 and 21; and (2) the doctor had renewed his gabapentin on the 22nd.  In his second information request, dated February 26, that must have crossed in the mail with Gohde's response to the first request, Myrick inquired about the status of his first request. Gohde responded to the second request on February 27, noting that it had been answered and returned, and further noting the medication prescription that he asked about had been renewed and would be sent to him as soon as it was filled.

Myrick also filed two inmate complaints regarding this long delay in receiving gabapentin -- CCI-2017-6341 and CCI-2017-12318.  He filed the first complaint on March 3, 2017, and included HSU Manager Gohde's responses to his two information requests about this issue.  The complaint examiner recommended affirmance on May 22, 2017, "because of the delay inmate Myrick experienced."  (Dkt. #84-4 at 1.)  The reviewing authority agreed, and defendant Dittmann received notification of that decision on May 27, 2017.  (Dkt. #84-4 at 2.)  Myrick filed the second inmate complaint on May 10, 2017, to which a nondefendant nursing supervisor was asked to respond.  This complaint was affirmed because the medication was abruptly discontinued without a timely follow-up or evaluation.  (Dkt. #84-3 at 2.)  Defendant Dittmann received notification of the reviewing authority's affirmance on June 28, 2017.

Dr. Syed was on leave from CCI between March 7 and March 31, 2017.  By mid-March, Myrick began sending HSRs again complaining that he was not being seen by a doctor despite repeatedly being told that he had an appointment.  Specifically, on March 11, Myrick stated that his back and leg were in severe pain and asked why he was not being seen.  Nurse Whalen responded that same day reassuring Myrick that an upcoming

doctor's appointment was scheduled for March 27.  Nondefendant nurses gave Myrick similar responses to his March 13 and March 21 HSRs.  In response to Myrick's March 24 HSR, however, a nondefendant nurse explained that there was no doctor regularly scheduled at that time, and Myrick was still on the list to be seen on March 29.  This nurse instructed Myrick to continue with his gabapentin, naproxen and Tylenol in the meantime.  A nondefendant nurse similarly responded to Myrick's March 29 HSR that he was scheduled to see a doctor.

Myrick continued to submit requests in April for an appointment, which continued to be rescheduled.  In response to Myrick's April 4 HSR complaining that his pain medications were not effective and again asking to see a doctor, a nondefendant nurse now indicated that he was scheduled to be seen on April 12.  On April 14, however, Myrick submitted yet another HSR asking to see a doctor, noting that his appointment had now been cancelled *five* times.  A nondefendant nurse responded that same day that Myrick was scheduled to be seen on April 28.  Similarly, defendant Nurse Anderson responded to Myrick's April 17 HSR that he was scheduled to be seen the following week and referred the HSR to the advanced care provider.  Finally, HSU Manager Gohde responded to Myrick's April 23 information request and HSR, indicating that he was scheduled to be seen on April 24.

Myrick was finally seen by a nondefendant, Dr. Springs, on April 27, 2017.  Dr. Syed attests that Myrick was not seen sooner because:  (1) contrary to the repeated promises, a doctor was not regularly scheduled at CCI at this time; and (2) Myrick's chronic condition did not require emergency treatment.  Regardless, on April 27, Myrick told Dr.

Springs that he was experiencing lower back pain that felt worse after he played basketball and handball, which kept him from sleeping at night.  Since Myrick already had current prescriptions for gabapentin, naproxen and Tylenol, that doctor ordered 25 mg of nortriptyline at night for six months.  Nortriptyline is an antidepressant commonly used to treat chronic pain.  Dr. Springs also ordered a back brace for a year and a TENS unit for a year, as well as imposed no-floor and first-tier restrictions.

In response, Myrick submitted two, follow-up HSRs.  On May 2, he asked about his back brace and new medication, to which Nurse Anderson responded that the doctor had not yet completed the order, but she would raise the issue when the doctor returned.  When Myrick made a similar inquiry on May 6, Nurse Valerius responded that:  the TENS unit had been sent to Myrick's unit that day; nortriptyline was started the day before; and Myrick needed to contact property to receive his back brace.  Although Myrick received a conduct report for misusing naproxen on May 7, the record does not indicate that his medication was discontinued as a result.  On May 12, Myrick saw another nondefendant nurse about his back pain.  That nurse referred Myrick's chart to the advanced care provider for review, while noting that Myrick already had a back brace, TENS unit, no-floor and first-tier restrictions, as well as taking nortriptyline.

Before he saw Dr. Springs on April 21, Myrick also filed another inmate complaint -- CCI-2017-10656 -- alleging that he had waited four months to see a doctor.  (Dkt. #18-1 at 51.)  The inmate complaint examiner contacted defendant HSU Manager Gohde for a response.  Gohde acknowledged Myrick's February, March and April HSRs, explaining that CCI had been without a regular doctor during this time.  She also noted that Myrick

18

was seen by nursing staff on February 14 and by a doctor on April 27. Although also acknowledging that Myrick had been scheduled on March 29 for a "must see" doctors appointment, Gohde stated that the doctor did not get a chance to see him. The complaint examiner recommended affirmance to acknowledge a delay for Myrick to see any HSU staff. While noting that Myrick had seen a doctor since filing the complaint, the complaint examiner found Myrick's initial assessment with nursing staff back on February 14 occurred "well beyond the mandated time limits." (Dkt. #18-1 at 51.) Gohde and defendant Dittmann received notification of the reviewing authority's affirmance on May 20, 2017.[8] (Dkt. #84-1 at 1.)

Myrick next submitted an HSR on June 1, 2017, stating that the pain in his lower back and left leg was getting worse, and nortriptyline had also become ineffective. As in the past, Nurse Wood responded that Myrick was scheduled to be seen by an advanced care provider, and she forwarded his HSR to the provider. Wood gave a similar response to Myrick's HSR on June 5. Moreover, Myrick actually saw Dr. Syed on June 8. At the time, defendant Syed described Myrick as alert with a stable gait, and noted that he was not experiencing acute distress. Once again, Myrick explained that his back was getting worse, the pain was waking him up at night, and the nortriptyline was no longer helpful. In response, Syed discontinued that antidepressant and prescribed a ten-day course of Tylenol #3, one tablet a day as needed. On June 14, Myrick again received a conduct report for misusing gabapentin, but the medication was still not discontinued.

---

[8] Gohde actually left CCI on May 15, 2017, *before* the reviewing authority issued this decision. (Dkt. #66 at 1.)

In a June 18 HSR, Myrick indicated that Tylenol #3 was helping, but he continued to have severe pain in his lower, left back and gluteal muscle.  Nurse Valerius responded that Myrick was scheduled to be seen that week.  On June 22, Myrick had a follow-up appointment with Dr. Syed.  In response to Myrick's report that Tylenol #3 had ultimately not been very helpful, Dr. Syed then referred Myrick to physical therapy and prescribed 100 mgs of tramadol twice a day as needed for ten days.

On July 10, 2017, Myrick submitted another HSR asking to see a doctor about his ongoing, severe lower back and leg pain.  Nurse Wood responded that he was scheduled to be seen in the HSU by a nurse that week.  Seen by a nurse on July 17 for his ongoing back pain, Myrick asked to see a doctor instead and for a follow-up appointment with neurosurgery since he had not been seen since 2015.  On July 24, Myrick submitted an HSR reiterating his request to see a doctor.  In response, a nondefendant nurse noted that he was scheduled for a follow-up with an advanced care provider.  Myrick received a similar response from a nondefendant nurse to his July 28 and July 31 HSRs, each of which emphasized that he had yet to see a doctor about his pain management.

Myrick saw defendant Dr. Syed again on July 31, 2017.  While Myrick does not dispute that Dr. Syed thought he appeared alert and comfortable during this appointment, he insists that he was in fact in severe pain.  Myrick reported to Dr. Syed that his pain had gotten worse since the 2015 MRI, especially while sitting, and that it tended to radiate down his left leg.  However, Myrick denied any problems walking, or any weakness, tingling, or numbness.  Dr. Syed ordered that Myrick could wear his own shoes to help alleviate his lower back pain, so long as security approved.  He also ordered an appointment

with the spine clinic at the University of Wisconsin, and prescribed Tylenol #3 three times a day for five days.  Because Dr. Syed did not see an objective clinical need for Myrick to continue taking gabapentin, and because it is often misused or diverted, he prescribed a tapered dose over the next five weeks.

On August 4, Myrick submitted an HSR complaining that he had not yet received his Tylenol #3.  A nondefendant, Nurse Grier, responded that same day, advising the medication had been received.  On August 23, Nurse Thorne reminded Myrick in response to his HSR asking about the reduced gabapentin dose that he was now on a tapered dose.  When Myrick was unable to see a doctor on August 28, he submitted an HSR complaining of severe back and leg pain.  A nondefendant nurse responded that he was scheduled to be seen very soon.  Nurse Anderson gave Myrick a similar response to an August 31 HSR, scheduling him for a nursing sick call in the meantime.

On September 6, Myrick submitted an HSR asserting that he was in severe pain because he was in restrictive housing and had to sleep on the floor.  Nurse Wood responded that he was scheduled to see a doctor, which he did the next day.  Specifically, Myrick saw Dr. Syed and asked to restart gabapentin because his back pain had gotten worse since that medication was stopped.  Dr. Syed agreed, and ordered 100 mgs of tramadol twice a day for ten days and 300 mgs of gabapentin three times a day for three months.  When Myrick submitted an HSR on September 13, asking for his gabapentin dose to be increased, Nurse Thorne reminded him that the order was for 300 mg three times a day.  On September 14, Myrick was seen by a nondefendant nurse for several issues, including ongoing back and leg pain.  Myrick again asked to see a doctor, but the unidentified doctor consulted that

day was unable to see him and noted that his "symptoms are not an emergency." (Dkt. #71-1 at 60.)

Myrick once again complained of pain in a September 15 HSR that also asked about a possible MRI. Nurse Valerius responded that his MRI had been scheduled, noting that Myrick had tramadol and gabapentin to help relieve his pain until those results could be reviewed by the doctor. On September 17, Valerius also responded to Myrick's HSR regarding his request to wear personal shoes, explaining that (1) the doctor had not written an order for special needs personal shoes, and (2) in any event, personal shoes were no longer allowed to be worn by any inmate outside of his housing unit or cell.

In response to Myrick's September 25 HSR expressing worsening back pain, Nurse Anderson scheduled him for another sick call, and on September 27, Myrick was seen in the HSU by Anderson. Still expressing concern about his gabapentin prescription, Anderson noted Myrick for a follow-up appointment. The next day, Dr. Syed renewed Myrick's prescription for 500 mgs of naproxen twice a day for six months. Just a few days later, on October 2, Myrick submitted another HSR stating that he was still experiencing severe lower back pain. Nurse Anderson responded by explaining that (1) he had only recently been seen for a nursing sick call and (2) all other interventions were currently outside the control of nursing staff. Anderson also noted that Dr. Syed had seen Myrick on September 7 and was scheduled for another visit in two weeks.

A month later, Myrick had an MRI of his lumbar spine. When compared with his 2015 MRI results, this October 6, 2017, impression revealed "[g]rossly unchanged multilevel degenerative disc disease without significant spinal canal or neural foraminal

narrowing." (Dkt. #71-1 at 132-33.)  On October 9, Myrick submitted an HSR asking to be seen now that the MRI was complete, to which Nurse Thorne responded that he was scheduled to be seen.  Nurse Anderson further informed Myrick in response to a similar October 18 HSR that he had a follow-up doctor's appointment scheduled for the next clinic day.

On October 23, Dr. Syed saw Myrick and reviewed the MRI results with him.  He then referred Myrick to physical therapy for an evaluation, prescribing 100 mgs of tramadol twice a day for ten days and ordering a follow-up appointment with the UW spine clinic. Syed also referred Myrick's special shoes request to the special needs committee for consideration.  However, Dr. Syed cancelled the spine clinic appointment the next day, after learning that one of its doctors, who had reviewed Myrick's MRI results, recommended a *nonoperative* trial of anti-inflammatory medications and physical therapy. In particular, given that there was some degenerative disease, but no significant central or foraminal stenosis, the spine clinic again declined to offer Myrick any specialized treatment.

On October 30, Myrick understandably submitted an HSR asking why Dr. Syed had cancelled his follow-up appointment with the spine clinic.  Nurse Anderson responded that Myrick should discuss that matter with Dr. Syed, and she scheduled a follow-up appointment with him.  In a November 1 HSR, Myrick asked to see the doctor again because he was in "severe pain."  Nurse Valerius responded that:  he had just been seen on October 23; his appointment regarding special shoes was scheduled for that week; and he had been referred to physical therapy.  Myrick also asked again about his spine clinic

appointment in a November 7 HSR and asserted that physical therapy would not be helpful.  Nurse Wood responded that since he was scheduled to be seen in the HSU that week, he should raise his concerns at his appointment.  Myrick was apparently next seen by another nondefendant, Nurse Waldstein, on November 29, who reviewed his chart and ordered several psychotropic medications.

On December 11, Myrick submitted another HSR, complaining of severe back pain and an expired gabapentin prescription, as well as the fact that he had not been seen by a doctor since October 23, despite sending several requests.  Myrick also submitted similar HSRs on December 20 and December 26, and an information request also dated December 26.  Apparently without seeing him, Dr. Syed then renewed Myrick's prescription for 300 mgs of gabapentin three times daily for six months on December 19.  Nursing Supervisor Hodge also informed Myrick that he was scheduled to see a doctor in an undated response to his information request.  While she did not respond to the HSRs until February 5, 2018, Hodge did note that by then Myrick had been seen on January 1 (by a nurse) and January 8, 2018 (by Dr. Syed), and was scheduled to be seen again by a doctor.

Between December 13, 2017, and January 31, 2018, Myrick also participated in five physical therapy sessions, but reported no improvement after trying several different therapies, including traction, a TENS unit, and exercises.  However, Myrick was willing to continue with a home exercise program because he was going to be released from DOC custody in November 2018.

### F.  Myrick's Medical Treatment in 2018

On January 2, 2018, Myrick filed inmate complaint CCI-2018-248, which alleged

that his gabapentin prescription was allowed to expire on December 8, 2017.  (Dkt. #84-2.)  The complaint examiner contacted defendant Hodge for a response.  Hodge noted that gabapentin was ordered for three months on September 7, 2017, and this order expired.  Hodge continued that by the time Dr. Syed renewed the prescription on December 19, and a 30-day supply sent on December 26, Myrick had missed nearly three weeks of this pain medication.  The examiner recommended affirmance and copied the HSU managers and the Deputy Warden "to provide any necessary follow-up with HSU staff regarding the re-writing of expired orders."  (Dkt. #84-2.)[9]

On January 2, Myrick also submitted yet another HSR stating that his back was constantly hurting.  Nursing Supervisor Hodge responded that day that he was scheduled to be seen in the HSU.  Nurse Gibbons, a nondefendant, saw Myrick the next day.  After reporting that his pain was still an 8 or 9 out of 10 -- even though he reported using his TENS unit, participating in physical therapy, and taking gabapentin three times a day -- Myrick asked that his gabapentin be increased from 300 mgs to 800 mgs.  Instead, Gibbons thoroughly reviewed Myrick's MRI results with him and discussed several, non-pharmacological interventions for his pain.  Dr. Syed also had a follow-up appointment with Myrick on January 8, at which he again complained of lower back pain, apparently prompting Dr. Syed to increase his gabapentin to 600 mgs three times a day for six months.  However, Dr. Syed discontinued gabapentin on February 6, after learning that Myrick had again been hoarding and misusing the medication.

---

[9] The court notes that defendant Weber was not yet the Deputy Warden.  (Dkt. #69 at 1.)

Myrick next submitted several HSRs in early February, again asking to see the doctor as his back pain was severe.  Although Hodge did not respond to his February 6 complaint until March 7, Nursing Supervisor Hodge responded to three such requests:  in response to the February 2 HSR, she indicated that Myrick was scheduled to be seen in the HSU; on March 7, she noted that Myrick had been seen on March 1; and she responded to Myrick's February 9 HSR that day, noting that Myrick had just been seen on February 7 and 8.  Other nurses also responded to Myrick's similar HSRs on February 19 and February 22, again indicating that he was scheduled to be seen.

Seeing Dr. Syed again for lower back pain on February 22, 2018, Myrick reported that his pain had gotten worse after he jumped from a bunk.  In contrast, Dr. Syed noted that Myrick was sitting comfortably in a chair, and his pain was sharply localized, without tingling or numbness in his extremities.  After discussing and agreeing with Myrick that the ultimate goal was for him to find some exercises to help himself with his chronic pain, Dr. Syed prescribed a ten-day course of tramadol.

When that tramadol ran out, Myrick submitted an HSR on March 7 asking for some kind of additional pain management.  Nursing Supervisor Hodge responded on March 8, indicating that Myrick was scheduled to be seen in the HSU.  On March 16, Myrick was seen by a nondefendant nurse for back pain, who noted that he was taking naproxen and had a TENS unit.  That nurse also discussed pain management techniques with Myrick, referring him for an appointment with an advanced care provider within two weeks.  In response to Myrick's March 27 request to see a doctor about his back pain, a nondefendant nurse noted that Myrick had been seen by a doctor on March 1 (apparently

26

referring to his March 1 visit with a physician for chest pain), and that he had a follow-up scheduled soon.  On April 2, defendant Hodge also indicated that Myrick was scheduled to be seen in response to his April 1 request for a doctor's appointment to address his lower back pain.  Another nurse gave a similar response to Myrick's April 3 request, while Nurse Valerius indicated in her response to Myrick's April 10 HSR that he was scheduled to be seen on April 12.

Myrick was apparently seen next by Dr. Syed on April 16 for his chronic lower back pain, as defendant Hodge noted in her response to plaintiff's April 13 HSR asking to see a doctor.  On April 16, Dr. Syed prescribed 500 mgs of naproxen daily for one year and 1000 mgs of Tylenol three times a day as needed.  Moreover, Dr. Syed renewed Myrick's gabapentin prescription for six months, while continuing his TENS unit and authorizing a second pillow for another year.

Nonetheless, Myrick submitted HSRs on April 23, 25, 30 and May 2, 2018, asserting continued, severe back pain, even though he was taking gabapentin again.  Nurse Valerius responded to Myrick's May 2 request that his doctor appointment had been rescheduled to the following day.  After examining Myrick again on May 3, Dr. Syed ordered Myrick a regular, flat mattress and increased his gabapentin dose to 800 mgs three times a day for six months.  Nursing Supervisor Hodge confirmed this visit in her response to Myrick's April 30 HSR.

On May 21, Myrick submitted yet another HSR request to see the doctor because while the increased dose of gabapentin helped, he was still in severe pain.  A nondefendant nurse responded that Myrick was scheduled for an appointment.  Dr. Syed next ordered a

new lumbar spine x-ray for Myrick on May 30, 2018, to see (1) if he had injured himself in a May 29 fight, and (2) whether there were any changes that would explain his ongoing back pain.  The radiology report received on June 4, 2018, again found "no radiographic evidence of acute disease in the lumbar spine."  (Dkt. #71-1 at 131.)

When Myrick submitted an HSR on June 5 complaining of back pain, and subsequently on June 11, June 14, June 18, and July 2, each time asking to see a doctor, nondefendant nurses responded that he had a doctor's appointment scheduled.  On July 5, Nursing Supervisor Hodge also responded to Myrick's June 25 HSR that he was scheduled to see the doctor on the following Monday.

Eventually, Dr. Syed did see Myrick again on July 9 for his complaints of increased lower back pain after being involved in a fight on May 29.  This time, Myrick reported trouble walking, but Dr. Syed observed that he was alert and had a stable gait.  Nevertheless, Dr. Syed once again prescribed tramadol and an anti-inflammatory ointment.

Myrick submitted his next pain related HSR on September 5, and a nondefendant nurse responded that he should have been seen the day he submitted the request.  In response to Myrick's September 9, September 21, and October 1 follow-up requests to see a doctor about his back pain, other nondefendant nurses also indicated that he had an appointment scheduled with Dr. Syed, who last saw Myrick on October 4, 2018.  At that appointment, Myrick again appeared alert, oriented, and comfortable.  Dr. Syed still prescribed one Tylenol #3 tablet three times a day for three days.  On October 12, the doctor also increased Myrick's gabapentin prescription to 800 mgs three times a day for

one year.  Myrick submitted a discharge medication request on October 21 for a two-week supply of his current medications upon discharge.  At discharge from DOC custody on November 6, 2018, Myrick was still taking gabapentin and naproxen, among other medications.

## OPINION

Plaintiff generally contends that between 2015 and 2018, defendants did not provide him effective treatment for his back pain and delayed his treatment by not scheduling him to see a prison doctor in a timely manner.  Defendants seek summary judgment on plaintiff's Eighth Amendment deliberate indifference claims on the basis that he has failed to put forth sufficient evidence to support a jury finding that defendants knew of and disregarded an excessive risk to his health.[10]

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The party opposing the motion for summary judgment may "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial."  *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (quoted

---

[10] Defendants also claim entitlement to qualified immunity.  Governmental actors performing discretionary functions enjoy "qualified immunity," meaning that they are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Estate of Escobedo v. Bender*, 600 F.3d 770, 778 (7th Cir. 2010) (quoting *Sallenger v. Oakes*, 473 F.3d 731, 739 (7th Cir. 2007)).  The court need not address defendants' qualified immunity defense, since Myrick has a clearly established right to be free from deliberate indifference to a serious medical need.  *Estate of Clark v. Walker*, 865 F.3d 544, 551-51 (7th Cir. 2017) (collecting cases).  Thus, the qualified immunity analysis for his claims turns on the merits as well.

source and internal quotation marks omitted); and all reasonable inferences are construed in favor of the nonmoving party.  *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).  However, "[t]he nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts."  *Siegel*, 612 F.3d at 937.  Indeed, summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial."  *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotation mark omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  Although there is no question that defendants' treatment of plaintiff here -- particularly Dr. Syed's -- leaves much to be desired, particularly with respect to the timeliness of physician visits, plaintiff ultimately fails to prove an essential element of his claims of inadequate medical care.

In this case, plaintiff's medical care claims are governed by the Eighth Amendment. A prison official may violate this right if the official is "deliberately indifferent" to a "serious medical need."  *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976).  For purposes of summary judgment, defendants concede that plaintiff's chronic back condition posed a serious medical need.  Therefore, the question is whether plaintiff has submitted enough evidence from which a reasonable jury could conclude that any of the defendants acted with deliberate indifference toward his serious medical need.

"Deliberate indifference" means that the officials were aware that the prisoner faced a substantial risk of serious harm but disregarded the risk by consciously failing to take reasonable measures to address it.  *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997).

Deliberate indifference constitutes *more than* negligent acts, or even grossly negligent acts, but may require something less than *purposeful* acts. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). The point of division between the two standards lies where (1) "the official knows of and disregards an excessive risk to inmate health or safety," or (2) "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," *and* he or she draws that inference yet deliberately fails to take reasonable steps to avoid it. *Id*. at 837; *see also Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) ("While evidence of malpractice is not enough for a plaintiff to survive summary judgment on an Eighth Amendment claim, nor is a doctor's claim he did not know any better sufficient to immunize him from liability in every circumstance.").

In cases like this one, in which a prisoner alleges that he received some treatment for his medical condition, but contends that the treatment was inadequate, the relevant question is whether the medical provider's actions were "such a substantial departure from accepted professional judgment, practice, or standard, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261-62 (7th Cir. 1996). Generally, courts must defer to a medical professional's treatment decision unless no minimally competent professional would have chosen the same course of treatment under the circumstances. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). A "[d]isagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id*. But a medical provider may violate the Eighth Amendment if the provider prescribes a course of

31

treatment without exercising medical judgment or one that the provider knows will be ineffective. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662-63 (7th Cir. 2016).

In *Petties,* the Seventh Circuit acknowledged the difficulty of applying this standard in the medical context, outlining examples of conduct that could support a finding of deliberate indifference:  when a doctor refuses to take instruction from a specialist; when a doctor fails to follow an existing protocol; when a medical provider persists in a course of treatment known to be ineffective; when a doctor chooses an "easier and less efficacious treatment" without exercising professional judgment; or where the treatment involved inexplicable delay lacking a penological interest.  *Petties*, 836 F.3d at 729-31.  The court is to look at the "totality of [the prisoner's] medical care when considering whether that care evidences deliberate indifference to serious medical needs."  *Id.* at 728.

Applying this standard to the evidence of record, a reasonable trier of fact could not find that any of the defendants were deliberately indifferent in handling Myrick's serious medical need.  The court will begin with the straightforward claims against Warden Dittmann and Deputy Warden Weber, then turn to the Nurse defendants, before addressing plaintiff's more complex claims against HSU Manager Gohde and Dr. Syed.

## I.  Michael Dittmann and Lucas Weber

Plaintiff contests the grant of summary judgment to defendants Dittmann and Weber, arguing that they should have intervened to improve his medical treatment. Although neither defendant was personally involved in plaintiff's medical treatment, they can still be held liable if they knew about a constitutional violation and had the ability to intervene, but failed to do so "with deliberate or reckless disregard for the plaintiff's

constitutional rights." *Koutnik v. Brown*, 351 F. Supp. 2d 871, 876 (W.D. Wis. 2004) (citing *Fillmore v. Page*, 358 F.3d 496, 505-06 (7th Cir. 2004)).  Here, plaintiff alleges that both were aware of a delay in scheduling his 2015 MRI and difficulty getting proper medical care due to an advanced care provider vacancy in the HSU.

Plaintiff's claim against Dittmann hinges on the fact that as CCI's warden, he was copied on the reviewing authority's decisions affirming plaintiff's medical needs inmate complaints.[11]  However, the inmate complaints plaintiff relies on do not reference any 2015 MRI scheduling delay, nor is there evidence that he contacted the warden directly about that issue.  Accordingly, a reasonable trier could *not* infer that Dittmann was ever aware of any issue related to the 2015 MRI delay.   Rather, plaintiff references those inmate complaints concerning a month-long delay in renewing his gabapentin prescription in early 2017 and in arranging for his appointment with a doctor that same Spring, both situations that had been investigated and resolved by the time Dittmann would have received notice of the decisions affirming plaintiff's complaints in May and June 2017.  (Dkt. ##18-1 at 51, 84-1, 84-3, 84-4.)  To the extent Warden Dittmann may have known about plaintiff's early 2017 gabapentin and appointment issues, it was indisputably *after* their resolution.  As a result, he cannot be said to have contributed to the alleged violations or disregarded an ongoing risk of serious harm.  *See Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir.

---

[11] The record actually suggests that copying the warden on inmate complaint decisions was not automatic.  For example, neither Warden Dittmann nor the deputy warden were copied on the reviewing authority's decision affirming with modification inmate complaint CCI-2018-244, in which plaintiff alleged that the HSU had been ignoring him since December 2017.  (Dkt. #84-5 at 1.)  For purposes of this motion, however, the court will assume that Dittmann's review (or responsibility to review) such complaint dispositions can be reasonably inferred.

1988) (to show personal involvement for purposes of finding supervisory liability under § 1983, the supervisor must "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see").

At worst, Dittmann may be faulted for failing to follow up as appropriate with the HSU staff under his supervision, such as the HSU manager, but this would amount to negligence (or even gross negligence) not deliberate indifference. *Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020) ("negligence, gross negligence, or even recklessness as the term is used in tort cases is not enough—the prison officials' state of mind must rise to the level of deliberate indifference."). Moreover, although Dittmann admits that he was generally aware of medical staff vacancies at CCI, there is no dispute that the DOC Bureau of Health Services was responsible for filling any advance care practitioner, doctor, and nurse practitioner positions. (Dkt. #95 at 7.) Accordingly, Dittmann is entitled to summary judgment.

As for Deputy Warden Weber, the evidence of record also warrants judgment in his favor. First, Weber did not become the deputy warden until after plaintiff was released from DOC custody. Second, while he was CCI's security director during this period, it is undisputed that he was not involved in providing or supervising inmate medical care, or in hiring HSU medical staff. Moreover, nothing in the record suggests that Weber was involved in the investigation *or* reviewed *any* of plaintiff's inmate complaints regarding medical issues or was copied on any of plaintiff's favorable rulings, nor that plaintiff ever contacted Weber directly regarding concerns about his medical treatment. Accordingly, there is also no evidence that Weber was personally aware of any unconstitutional conduct

34

related to plaintiff's medical care, even if one assumes he had the ability or authority to correct such conduct.

Finally, neither Dittmann nor Weber had a personal obligation to ensure that plaintiff's medical needs were met.  *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("Public officials do not have a free-floating obligation to put things to rights.").

Plaintiff also maintains that in February 2018, defendant Weber in particular ordered that his gabapentin prescription be discontinued knowing that plaintiff would be in severe pain without this medication.  Security Director Weber admits that he would *inform* the HSU of inmate conduct reports for misusing medication, but contends that he was not involved in the decision to discontinue plaintiff's medication as he was not medically trained or part of medical staff.  Plaintiff does not dispute that decisions to change or discontinue medication were made by medical staff.  (Dkt. #95 at 12.)  Still, plaintiff insists that Weber took things a step further in February 2018 by *ordering* that his gabapentin prescription be abruptly stopped after Myrick received a conduct report for, among other violations, misusing his medication.  (Dkt. #72-1 at 20.)

In support of this assertion, however, plaintiff points only to the fourth paragraph of the state defendants' brief, which makes no such assertion nor refers to record evidence that does.  (*See* dkt. #73 at 2-3.)  Nor is there any such suggestion in the proposed findings of fact or Weber's declaration.  (Dkt. ##69, 95.)  Moreover, Dr. Syed asserts that *he* discontinued Myrick's gabapentin in February 2018 after learning that he had been hoarding and misusing it, just as he discontinued plaintiff's Tylenol #3 and tramadol

prescriptions in 2015 for the same reason.[12]  (Dkt. ##67 at 2, 6, 17; 95 at 68.)  This leaves only plaintiff's own, unsupported speculation as to Weber's involvement in his medication decisions, which is simply insufficient to meet his burden of production at summary judgment.  *See Siegel*, 612 F.3d at 937 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  Because a reasonable trier of fact could not find deliberate indifference on these facts, Weber is also entitled to summary judgment in his favor.

## II.    Nurses Anderson, Thorne, Valerius, Wood, Walters, and Whalen

Plaintiff generally contends that the nurse defendants unreasonably delayed his medical care by failing to ensure timely appointments with prison doctors, despite his repeated submissions of HSRs from 2015 to 2018 about being in pain and needing to be seen for his chronic back issue.  As an initial matter, as noted in the fact section above, these named defendants reviewed some, but certainly not all, of plaintiff's many HSRs during this period.  Moreover, plaintiff admits that many of his HSRs "were responded to in a time appropriate manner," although he asserts that some went unanswered.  (Dkt. #82:1-2, 9-10, 14.)  Even this assertion is an overstatement, since the medical records do

---

[12] Myrick asserts that Dr. Syed showed no regard for his wellbeing in discontinuing his gabapentin because abruptly stopping that medication can cause seizures.  In support, Myrick relies on patient education instructions about gabapentin.  (Dkt. #84-9.)  Those instructions indicate that gabapentin can be prescribed for nerve pain and to control partial seizures in adults with epilepsy.  (Dkt. #84-9 at 1.)  Although stopping gabapentin abruptly can apparently result in increased seizures when taken for seizures (dkt. #84-9 at 2), Myrick does not allege that he was epileptic, suffered seizures, or was prescribed the drug for a reason other than pain management.

not suggest that any of the nurse defendants *ignored* plaintiff's HSRs related to his chronic back pain.[13]

For example, Whalen responded to plaintiff's April 3, 2015, and March 11, 2017, requests to see a doctor for back pain within two days, assuring plaintiff each time that a doctor's appointment was scheduled.  Defendant Wood similarly responded within two days to each of the five 2017 requests that she fielded for a doctor's appointment, indicating that plaintiff was scheduled to be seen either by an advanced care provider or by another nurse in the HSU.  Defendant Thorne similarly responded to approximately eight HSRs between 2015 and 2017 within at most four days of receipt.  Specifically, depending on the issue plaintiff presented, Nurse Thorne indicated that plaintiff was scheduled to be seen by a doctor or a nurse, or she addressed other concerns raised by the plaintiff, such as a request for a low bunk restriction.  As for defendant Walters, she reviewed one pain related HSR in January 2017 within a day of its receipt by instructing plaintiff to request a sick call for an evaluation, and responded to a February 14 HSR by documenting her recent evaluation of plaintiff.

As for defendant Anderson, she reviewed and responded to approximately 14 HSRs between 2015 and 2017.  In most cases, plaintiff asked to be seen for his back pain, and Nurse Anderson nearly always responded within a day of receipt, on each occassion indicating that he was scheduled to see a physician or for a nursing sick call.  She also

---

[13] In support, plaintiff points to his affirmed inmate complaints collectively.  (Dkt. #82:14.)  One of those complaints, CCI-2018-244, was affirmed in part because there was a delay in responding to an HSR asking when plaintiff would receive medical shoes.  (Dkt. #84-5 at 1.)  However, plaintiff is not proceeding on a claim related to medical shoes in this case.

examined plaintiff herself in September 2017.  Defendant Valerius also responded to approximately 14 HSRs between 2015 and 2018, in which he often asked to see a doctor or be returned to a related specialist for back pain, sought prescription refills, or made special needs requests for a lower bunk restriction or support shoes, among other items. Nurse Valerius typically responded within a day of receipt as well, indicating that:  plaintiff was scheduled to be seen; updating him on the status of certain prescriptions, specialist referrals or other requests; forwarding requests to the appropriate provider; or otherwise addressing plaintiff's specific issues.

In short, while action was not always achieved as promised (especially with respect to timing), all of the record establishes the defendant nurses consistently reviewed plaintiff's HSRs and *responded* timely to his requests for help managing his chronic condition.  *See Towns v. Anderson*, No. 17-cv-912-bbc, 2019 WL 2173927, at *9-10 (W.D. Wis. May 20, 2019) (granting summary judgment to a nurse on a claim of delay in doctor appointments where staff timely reviewed plaintiff's HSRs and routinely scheduled him for sick calls and doctor appointments).  In contrast, the record largely supports plaintiff's complaints that many of the promised doctor appointments were repeatedly pushed back or rescheduled over the years.  Plaintiff emphasizes in particular that in early 2017, he waited about *four* months to see a doctor, albeit during a period of time when CCI was without a regular doctor, in part because of Dr. Syed's month-long leave of absence.

Plaintiff was primarily concerned with seeing a doctor because a nurse could not prescribe the pain medications he was requesting, and he would fault the defendant nurses for not doing more to ensure that he was seen without delay, such as immediately

contacting the doctor in response to an HSR or following up personally to arrange for a prompt visit.  Although certainly a mixed picture, here, too, the record indicates that plaintiff was seen on a relatively regular basis by Dr. Syed, other doctors and various nurses for his chronic back pain.  It is further undisputed that these defendant nurses were not involved in creating the list of patients a doctor would be scheduled to see each day, nor did they control how a doctor triaged his or her patient list on a given day.  Finally, although plaintiff may disagree with how these nurses triaged his HSRs over other demands on their time, plaintiff's own allegations of pain do not establish that his chronic condition ever required an emergency response, much less one that should take priority over others' medical needs.  Even if plaintiff had produced conflicting evidence on this point, neither a difference of opinion about prioritizing medical treatment, nor even gross negligence in doing so amounts to proof of deliberate indifference.  *See Bryant v. Madigan,* 84 F.3d 246, 249 (7th Cir. 1996) ("[T]he courts have labored mightily to prevent the transformation of the Eighth Amendment's cruel and unusual punishments clause into a medical malpractice statute for prisoners.").

At bottom, plaintiff has not specified any evidence suggesting that the appointment rescheduling he experienced was attributable to any of these named defendant nurses' alleged deliberate indifference, rather than scheduling difficulties resulting from an institutional lockdown, the unavailability of a physician, or other possible reasons.  *See Forstner v. Daley*, 62 F. App'x. 704, 706 (7th Cir. 2003) (finding that a delay of 26 months for treating a knee joint injury was caused mainly by transfer of inmate and scheduling problems with outside physicians and therefore not deliberate indifference); *Zimmerman v.*

39

*Prison Health Services, Inc.*, 36 F. App'x 202, 203 (7th Cir. 2002) (explaining that a delayed biopsy resulting from "bureaucratic obstacles and perhaps negligence" and "scheduling difficulties" was not unconstitutional).  Certainly, plaintiff has offered insufficient evidence for a reasonable jury to infer that any of these defendants' responses to his HSRs were generally the product of deliberate indifference.

In fairness, plaintiff also *specifically* complains that CCI's HSU nursing staff did not take more urgent action after a nondefendant nurse practitioner discontinued his high-dose gabapentin prescription upon his transfer back to CCI from the Wisconsin Resource Center in January 2017.  In discontinuing the medication on January 23, this nondefendant ordered an "MD visit to discuss gabapentin use and continuance."  (Dkt. #71-1 at 108.)  Defendant Walters next scheduled a doctor's appointment on February 14, 2017, after evaluating plaintiff during sick call.  (Dkt. #71-2 at 65.)  However, without having seen plaintiff for an appointment, Dr. Syed simply renewed the prescription on February 22 after plaintiff submitted numerous HSRs about the problem.

While defendants Valerius, Anderson and Walters reviewed some of these HSRs before the prescription was renewed, their individual responses do not allow for a reasonable finding of deliberate indifference.  In his January 27 and January 28 HSRs, plaintiff did not ask to be seen; rather, he explained that:  his gabapentin had expired; his pain was worsening; and he needed the medication.  (Dkt. #71-2 at 72-73.)  In the latter request, plaintiff added that he still had naproxen as well as a back brace and a lower bunk restriction.  Valerius responded on January 28 and Anderson on January 31, both confirming that the prescription had expired on January 23 and forwarding the renewal

40

request for review.  Absent evidence form which to reasonably infer that plaintiff (who had other pain relief in place) required emergency care or that these defendants were aware requests for a physician's review of pain medications would be wholly ignored, a reasonable jury could not conclude that by acknowledging the expiration of a prescription and forwarding the request to a person with the authority to prescribe medication, either defendant Valerius and Anderson acted with deliberate indifference.

Having said that, defendant Walters' response to plaintiff's January 30 HSR in particular presents a closer question.  In that request, plaintiff stated that:  (1) he was out of gabapentin; (2) he had written "numerous times requesting to be seen and asking why [he] was tak[en] off this medication without being seen by a" doctor; and (3) he emphasized for good measure that "something needs to be done!" (Dkt. #71-2 at 71.)  In her next-day response, rather than seek a physician's input, Nurse Walters instructed *plaintiff* to request a "sick call" to be evaluated.  Moreover, when plaintiff did so via HSR received by HSU on February 3 *and* was *seen by Walters* on February 14, she merely scheduled him to see a doctor.  However, plaintiff presents no evidence beyond his own allegations of pain that his situation merited an emergency response, nor that the discontinuation of his gabapentin when he still had other options for pain relief was so *obviously* problematic that Walters failure to act immediately to address it amounted to deliberate indifference, particularly if you factor into the equation that plaintiff's medical history includes a wide variation of approaches to his ongoing back pain, possible manipulation to hoard (or even triple) pain medications, and the need for nurses to exercise judgment in triaging HSRs.

41

Finally, plaintiff rightly points out that two of his inmate complaints about delays in being seen by a nurse or a doctor after his gabapentin was discontinued were determined *by CCI* to be well founded (dkt. ##84-3, 84-4), but a reviewing authority's affirmance is not a proxy for a constitutional violation.  Nor is there any evidence that Nurse Walters or any of the other nurses were responsible for or aware of those delays after plaintiff was scheduled for a sick call or of a nondefendant nurse practitioner's order for a doctor's appointment.  Nor, to the extent that Walters in particular was negligent or even grossly negligent for not automatically scheduling plaintiff for a sick call or personally following up to ensure his doctor's appointment actually occurred in response to his request, that is still not deliberate indifference. *Butler*, 960 F.3d at 426.

In the end, while the court understands plaintiff's frustration with these repeated delays, because he was uncomfortable and not always seen by a physician as soon as he would have liked, or even as he had reason to expect, the record does not suggest that any of the defendant nurses ignored his HSRs for an urgent or emergency medical need, nor that they intentionally denied or delayed his appointments with physicians.  Importantly, deliberate indifference is high standard shown by "something approaching a total unconcern for" plaintiff's welfare.  *Rosario v. Braun*, 670 F.3d 816, 822 (7th Cir. 2012).  Here, a jury might infer a lack of urgency or professionalism as overworked prison nurses were repeatedly asked to respond to plaintiff's chronic back pain, but not deliberate indifference. Because a reasonable jury could not conclude that these defendant nurses acted with *deliberate indifference* in their efforts to assess and triage plaintiff's requests,

42

defendants Anderson, Thorne, Valerius, Wood, Walters, and Whalen are entitled to summary judgment in their favor.

## III.   Nursing Supervisor Hodge

As for Nursing Supervisor Hodge, plaintiff's complaint would appear to have more merit as a matter of common sense:  after all, the buck for repeatedly breaking promises for timely prescription reviews and physician visits would appear, at least facially, to stop with the nurse in charge of scheduling.   However, plaintiff's complaint contains few, specific allegations against her, and his opposition brief does not even *mention* her beyond his description of the parties.  (Dkt. ##18 at 18, 82.)  Instead, plaintiff generally implies that as with the other nurses under her apparent charge, she, too, prevented him from seeing a doctor in a timely manner despite reviewing some of his HSRs complaining of back pain and asking for a doctor's appointment.

In responding to plaintiff's assertion, the court must begin by noting that Hodge started working at CCI on December 10, 2017.  As a result, she was not involved in plaintiff's medical care before then.   Moreover, the record shows that she reviewed numerous, similar HSRs from plaintiff in January through April and in June 2018, complaining of ongoing back pain and once that his tramadol had run out.  (Dkt. ##71-1 at 153; 71-2 at 4-7, 134, 137, 141, 154.)  As with the other nurses, defendant Hodge would almost always respond to these requests within a few days of receipt, as well as document plaintiff's recent visits with a physician or indicate that he was scheduled to be seen.  And again, as previously noted, plaintiff offers no evidence (other than his subjective assertions of pain) that his condition ever merited an emergency response, or that the

expiration of his tramadol in March 2018 was so obviously problematic that a triage nurse should have acted immediately to address it.  And to the extent the appointments Hodge scheduled or confirmed in her responses were ultimately delayed or rescheduled, the record does not suggest that she had any more control over how a doctor triaged his or her patient list or over other "scheduling difficulties" than did the other nurses under her charge.  *See Zimmerman*, 36 F. App'x at 203.

Still, there is one cluster of delayed responses from Hodge that merits specific consideration, if not ultimately leading to a finding of a deliberate indifference.  On or about December 8, 2017, plaintiff's gabapentin prescription expired for a second time.  Plaintiff then filed three HSRs, which HSU received on December 11, 20, and 26, along with an information request dated December 26 and addressed to a nondefendant, all containing plaintiff's complaints of serious pain without gabapentin and asking to see a doctor to restart the prescription.  (Dkt. ##18-1 at 53; 71-2 at 8-9, 11.)  Defendant Hodge, who as noted began working at CCI on December 10, responded to three HSRs on February 5, 2018, indicating that plaintiff was scheduled to be seen by a doctor.  She conveyed that same information in an undated response to plaintiff's information request.  Neither response addresses plaintiff's request for gabapentin, although that is likely because Dr. Syed had already renewed plaintiff's prescription back on December 19, 2017.  However, the summary judgment record, which puzzlingly does not include a declaration from Hodge, sheds no light on what prompted Dr. Syed to do so, nor why Hodge did not respond sooner or when she even first reviewed these requests.  To deny Hodge summary judgment on this basis, however, the court would have to find that a trier of fact could

44

reasonably infer Hodge was aware of but ignored these requests for help before the medication was prescribed.  Although the court must view the evidence in the light most favorable to plaintiff, *Gonzalez*, 761 F.3d at 877, he offers no affirmative evidence from which a jury could reasonably draw that inference or attribute any delay in renewing plaintiff's gabapentin to Hodge.  Indeed, on this record, a reasonable trier could only speculate.  Hodge is therefore entitled to summary judgment in her favor.

## IV.    HSU Manager Gohde

Although HSU Manager Gohde is even more subject to an inference that "the buck stops here," the record evidence is sparse as to her personal involvement.  *See Mitchell v. Kallas*, 895 F.3d 492, 498–99 (7th Cir. 2018) (liability under 42 U.S.C. § 1983 requires personal involvement).  Specifically, plaintiff claims that defendant Gohde did nothing in response to his complaints of ongoing back pain and difficulty seeing a doctor from January through April 2017, which is true as far as it goes, but the undisputed facts also show that Gohde responded to the extent she was made aware of plaintiff's HSRs.  For example, plaintiff submitted an information request dated February 5, 2017, alleging that he had written to the HSU several times about his expired gabapentin prescription and his request to see a doctor.  (Dkt. #71-2 at 167.)  Gohde's representation that she was not consulted on the decision to discontinue plaintiff's gabapentin is uncontradicted.  Moreover, Ghode explains in her declaration that information requests or HSRs addressed to her are first triaged by nurses, and she typically does not triage them.  (Dkt. #66 at 4, 6.)  Although she has no specific memory, Gohde does acknowledge that she likely reviewed plaintiff's information request on February 22, 2017, given the appointment dates that she noted in

her response.  (Dkt. #66 at 5-6.)  However, even if a trier of fact were to infer that in reviewing his medical records that day, Gohde learned plaintiff had recently been evaluated twice by nurses because his gabapentin had not been renewed, the record also shows Dr. Syed restarted the prescription that same day (dkt. #66 at 6-7), meaning that Gohde either prompted Syed's action or determined that the issue had been resolved (or both).  Indeed, the record shows that plaintiff sent Gohde a follow-up information request on February 26, Gohde responded to both his February 22 and 26 requests the next day, noting that his gabapentin prescription had been renewed.  And when, on April 23, plaintiff sent Gohde a third information request and submitted an HSR, both stating that plaintiff was still in pain and had still not been able to see a doctor, she again responded the next day by indicating that plaintiff was scheduled to be seen.  (Dkt. #71-2 at 49-51.)  Plaintiff then saw Dr. Springs on April 27, meaning the only direct evidence demonstrates that Ghode took prompt action once made aware of plaintiff's complaints.

Moreover, plaintiff does not present evidence suggesting that Gohde was aware of or ignored plaintiff's ongoing complaints of appointment delays after resolving the gabapentin issue.  Although plaintiff sent numerous HSRs throughout March and April asking for a doctor's appointment, none were reviewed by Gohde before his April 23 request.  (Dkt #71-2 at 52-60.)  As for the April 21 inmate complaint raising the issue of ongoing appointment delay, Gohde did provide a response, but only after plaintiff had been seen by Dr. Springs and that issue appeared resolved.  (Dkt. #18-1 at 51.)

This then leaves the question of Gohde's responsibility for making sure that HSU's possible systemic issues with failing to insure timely involvement of a physician after

46

promising to arrange an appointment, particularly when an inmate has complained of a discontinuation of a pain medication or other ongoing medical issues.  Certainly this record is concerning in that last regard, but as already discussed above, plaintiff's chronic back pain, for which no underlying physical cause could be found and various pain medications were prescribed off and on, is not enough to find deliberate indifference by the HSU Manager, at least absent some evidence that Gohde was aware that an urgent medical need was going unaddressed.   Because the record instead shows that Gohde timely and reasonably responded to the complaints she received, a reasonable jury could not find that she exhibited deliberate indifference.

## V.     Dr. Syed

Perhaps acknowledging the difficulty in proof as to the other defendants, the focus of plaintiff's complaint is on Dr. Syed's failure to provide certain pain medications without breaks in prescription.  According to plaintiff, the problem was that Dr. Syed would only prescribe him short courses of Tylenol #3 or tramadol, and at times also discontinued or failed to renew gabapentin, requiring plaintiff to submit repeated HSRs requesting a doctor's appointment to restart these prescriptions.  According to plaintiff, this cycle evidences Dr. Syed's deliberate indifference to his ongoing back pain.  Although this is a much closer question, the court must grant summary judgment in Dr. Syed's favor on the present record.

The court begins with plaintiff's requests for long-term use of Tylenol #3 and tramadol, as well as ever stronger doses of gabapentin.  As noted, "[t]he federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that

47

decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).  On the summary judgment record, no jury could reasonably conclude that Dr. Syed's treatment decisions were "blatantly inappropriate." *Id.*  At bottom, plaintiff's claim amounts to a mere disagreement with Dr. Syed's medical judgment. *See Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003) (dissatisfaction or disagreement with the method of treatment does not constitute an Eighth Amendment claim of deliberate indifference.)

The summary judgment record evidences that Dr. Syed exercised and informed his medical judgement in various ways, without persisting in a course of pain treatment that was obviously inadequate.  In particular, the record shows that Syed responded to plaintiff's ongoing complaints of chronic back pain by trying different combinations of pain medications in different doses in conjunction with non-medication treatments to provide relief.  He began by prescribing three months of Tylenol and naproxen, two weeks of tramadol, and a back-support belt, extra pillow, and a lumbar x-ray, all of which were unremarkable.  When plaintiff's pain persisted, Dr. Syed changed course and ordered a toradol injection, discontinued regular Tylenol, and ordered a ten-day course of Tylenol #3.  Next, Dr. Syed added a back-support brace, three months of ice bags, and a two-week course of Tylenol #3.  Over the next three years, Dr. Syed continued to prescribe longer courses of naproxen in 500 mg doses, as well as gabapentin, varying the dosage strength from 300 mg, to 600 mg and up to 800 mg in response to plaintiff's continued complaints. He would also discontinue medications such as nortriptyline and ibuprofen at plaintiff's

request.  Moreover, Dr. Syed ordered continued use of a TENS unit, physical therapy in 2015 and 2018, and a flat mattress.

Although Dr. Syed would prescribe only short courses of Tylenol #3 or tramadol, despite plaintiff's repeated requests for long-term use of these medications, he did increase the strength of plaintiff's tramadol dose from 50 mg to 100 mg.  Moreover, it is telling that Dr. Hoffman and another nondefendant doctor also limited their Tylenol #3 and tramadol prescriptions for plaintiff to ten-day courses, suggesting that Dr. Syed's conservative use of these medications did not fall outside accepted practices.  (Dkt. ##71-1 at 28, 71-2 at 128.)  On top of this evidence, Dr. Syed was aware, due to plaintiff's ankle injuries, of the undisputed record evidence that plaintiff's chronic pain was sufficiently controlled to allow him to play sports, including basketball throughout this period.

To investigate the cause of plaintiff's pain and help inform his treatment plan, Dr. Syed would periodically refer plaintiff for diagnostic testing.  After plaintiff's lumbar MRIs in 2015 and 2017, Dr. Syed was advised by the specialty clinic that no follow-up consults were necessary given the mild findings.  The specialists recommended that plaintiff simply engage in physical therapy instead, which Dr. Syed ordered after each MRI.  Importantly, although the 2017 MRI showed some degenerative disease, the specialist recommended only a nonoperative trial of anti-inflammatory medications, which Dr. Syed had already been using in the form of naproxen and ibuprofen.  In other words, the specialists did not advise Dr. Syed to treat plaintiff any differently than he had been doing already.  A second lumbar x-ray in 2018 also did not show any acute disease.  These consistently unremarkable test results, coupled with the specialists' conservative treatment

recommendations, simply do not support a finding that Dr. Syed's treatment choices were "blatantly inappropriate" or inadequate. *Fahim*, 771 F.3d at 409.

A reasonable trier of fact would also have to keep in mind institutional security concerns, given that Dr. Syed was tasked with managing plaintiff's chronic pain in light of his history of misusing medications, including gabapentin. As plaintiff notes, Dr. Syed discontinued certain pain medications at various times, but this is not a case of prison officials withholding prescribed pain medication as a "gratuitous cruelty." *Walker v. Benjamin,* 293 F.3d 1030, 1040 (7th Cir. 2002). Rather, there is no dispute that Dr. Syed discontinued plaintiff's Tylenol #3 and tramadol prescriptions in August 2015, and his gabapentin in February 2018, because plaintiff had received conduct reports for misusing his medications. Notably, even then, Dr. Syed did not discontinue *all* of plaintiff's pain medication at any one time. The concern for inmate misuse also informed Dr. Syed's decision to wean plaintiff off gabapentin in 2017, with the goal of decreasing plaintiff's reliance on medications for pain relief. That Dr. Syed restarted these medications is not indicative of earlier deliberate indifference, rather it shows that he was exercising his professional judgment by constantly re-evaluating the risks and benefits of using certain pain medications to treat plaintiff's chronic pain. *See Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) (stating that "[u]sing [pain killers] entails risks that doctors must consider in light of the benefits."). In sum, rather than simply prescribe plaintiff a continuous combination of pain medications in strong doses as plaintiff wanted, the summary judgment record shows that Dr. Syed exercised medical judgment by varying pain relief interventions and medication doses in response to plaintiff's complaints and in light of

plaintiff's circumstances, as well as prescribed other physical therapies, and enlisted specialists to get at any underlying cause when no combination of treatments seemed to provide long-term relief.

As the Seventh Circuit has noted, "treating pain allows considerable room for professional judgment." *Norwood v. Gosh*, 723 F. App'x 357, 365 (7th Cir. 2018). The undisputed facts here show that Dr. Syed exercised medical judgment in taking a conservative approach to the use and dosing of Tylenol #3, tramadol and gabapentin to treat plaintiff's chronic pain. While plaintiff disagrees with that approach, he is not entitled to a specific medical treatment of his choice. *Forbes*, 112 F.3d at 267. Nor is a "mere disagreement with a doctor's medical judgment" (or even medical malpractice) "enough to prove deliberate indifference in violation of the Eighth Amendment." *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010). "Medical professionals cannot guarantee pain-free lives for their patients." *Gosh*, 723 F. App'x at 365. Because plaintiff has not presented evidence that Dr. Syed's conservative use of these pain medications fell below an accepted standard of care for a prison physician in light of the record in this case, *Fromm*, 94 F.3d at 261–62, a reasonable jury could not find that Dr. Syed was deliberately indifferent on this theory of liability.

## VI.   Troubling Lapse in High-Dose Gabapentin Prescription

This leaves plaintiff's claim that he went without any gabapentin for a month in early 2017, which presents the most troubling set of facts. Specifically, plaintiff alleges that he needlessly suffered a month of severe, worsening back pain despite there being a

seemingly straightforward and simple treatment—renewal of one of his prescription pain medications that plaintiff had been taking for long time.   Delaying treatment may constitute deliberate indifference if such delay "exacerbated the injury or unnecessarily prolonged an inmate's pain." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) (citing *Estelle*, 429 U.S. at 104–05).   The length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment.  *See Grieveson v. Anderson*, 538 F.3d 763, 778–80 (7th Cir. 2008) (guards could be liable for delaying treatment for painful broken nose by at least a day-and-a-half); *Cooper v. Casey*, 97 F.3d 914, 916–17 (7th Cir. 1996) (presented jury question "whether the plaintiffs were in sufficient pain to entitle them to pain medication within the first 48 hours after the beating").

Although the court remains concerned that plaintiff's high-dose gabapentin prescription was abruptly stopped for a month, particularly in light of his repeated requests for help, a reasonable jury could not conclude on the summary judgment record that any of the named defendants unreasonably delayed renewing this prescription in early 2017, including Dr. Syed.  First, the record is clear that a nondefendant, nurse practitioner and *not* Dr. Syed made the unilateral decision to discontinue plaintiff's gabapentin upon his transfer from the Wisconsin Resource Center.   Second, although the nurse practitioner ordered a doctor's appointment, and plaintiff's first two HSRs about the issue were forwarded to a doctor and advanced care provider respectively, there is *no* evidence that Dr. Syed was the only provider with the authority to prescribe medications at CCI at that

time or would have received those requests, much less that he *did* receive them.[14]  Third, the record indicates that when defendant HSU Manager Ghode (or someone else) brought the issue to Dr. Syed's attention on February 22, he renewed plaintiff's gabapentin prescription that same day, at least suggesting that he would have responded similarly to plaintiff's earlier HSRs had he received them.

"[T]he infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in the criminal law sense." *Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015) (citation omitted).  As repeatedly noted above, even gross negligence is not enough.  *Id.*  To the extent that a reasonable jury could find Dr. Syed or any of the other named defendants were grossly negligent or mistaken in failing to review plaintiff's records more carefully, or in tracking or timely reviewing any HSRs that were forwarded to them, it would still not support a finding of deliberate indifference.  *See Robbins v. Waupun Correctional Institution*, No. 16-CV-1128, 2016 WL 5921822, at *3 (E.D. Wis. Oct. 11, 2016) (an "isolated mistake does not allow a plausible inference of deliberate indifference"); *see also Burton*, 805 F.3d at 785 ("without evidence that defendants acted with the requisite bad intent in delaying the dispensation of his medication, Burton's allegations are insufficient to sustain a deliberate indifference

---

[14] Problematically, although understandable given the passage of time, Dr. Syed's declaration sheds no light on this question.  (Dkt. #67 at 11-12.)  Specifically, he acknowledges that the prescription was discontinued and plaintiff submitted several HSRs about the issue, but Dr. Syed does not state whether he was in fact made aware of the issue before February 22.  Rather, Syed merely emphasizes that he was not responsible for scheduling appointments with patients.  (Dkt. #67 at 11.)  Even so, there is no factual basis for a reasonable jury to infer such knowledge on this record.  If anything, as discussed above, the evidence is that Dr. Syed acted promptly to reinstate the gabapentin prescription when it was finally brought to his attention.

claim.")  Absent some evidence to suggest that defendants knew or had reason to know that plaintiff's pain medication had been discontinued indefinitely, a reasonable jury could not find deliberate indifference.  Accordingly, defendants are also entitled to summary judgment in their favor on this most troubling delay.

For the reasons stated above, therefore, the court will grant defendants' motion for summary judgment.  However, this is an unsatisfying result with respect to the month-long delay in renewing plaintiff's gabapentin after his 2017 transfer back to CCI from the Wisconsin Resource Center.  On this summary judgment record, none of the named defendants involved in that decision could reasonably be found to have exhibited deliberate indifference to plaintiff's plight.  Nonetheless, it is disconcerting at best that an inmate transferring into CCI apparently could have a high-dose pain prescription abruptly discontinued without proper procedures in place to follow-up timely, leaving that inmate without (apparently needed) pain medication for an indefinite period of time.  Both DOC generally and CCI in particular may be well served to review its relevant policies and procedures with the goal of avoiding future instances of unexplained delays in ordered medical treatment as occurred in this case.[15]

---

[15] This court recently cautioned CCI regarding a similar HSU staff failure in 2016 to follow-up timely and complete a physician's referral to a urologist.  *See Sierra-Lopez v. Lamarca*, 17-cv-599-wmc, 2020 WL 3574772, at *11 n.15 (W.D. Wis. July 1, 2020).  At some point, such repetition may support a broader claim against the health administrators at CCI.

ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #65) is GRANTED.

2) Plaintiff's motion for assistance in recruiting counsel (dkt. #87) is DENIED as moot.

3) The clerk's office is directed to enter judgment in defendants' favor and close this case.

Entered this 27th day of August, 2020.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

55